KARL SCHACK AND EDNA C. SCHACK, PLAINTIFFS-RE-
SPONDENTS, v. ROBERT P. TRIMBLE, BUILDING IN-
SPECTOR, &c., DEFENDANT-APPELLANT.

Argued September 8, 1958—Decided October 6, 1958.

*Mr. William J. O'Hagan* argued the cause for the defendant-appellant (*Messrs. Stout & O'Hagan,* attorneys).

*Mr. Morris Weinstein,* Newark, argued the cause for the plaintiffs-respondents (*Messrs. Anschelwitz & Barr,* attorneys; *Mr. Bernard A. Kaminsky* of counsel).

The opinion of the court was delivered by

BURLING, J. Defendant, building inspector of the Borough of Deal, Monmouth County, New Jersey, denied plaintiffs' application for a building permit to construct a one-family residence. Plaintiffs instituted a proceeding in lieu of prerogative writ in the Superior Court, Law Division, praying that the defendant be required to issue the desired permit. That court, after a hearing, dismissed the plaintiffs' action. On appeal, the Appellate Division reversed, 48 *N. J. Super.* 45 (1958), and we granted the defendant's petition for certification. 26 *N. J.* 302 (1958).

In 1944 plaintiffs, husband and wife, purchased a lot and one-family residence and attached garage located on the northeast corner of Parker and Norwood Avenues in the Borough of Deal. The lot is designated on the borough's tax map as lot 11A. Although unknown to plaintiffs at the time of purchase, the dwelling house was so located on the lot as to result in a violation of the applicable rear- and side-yard area requirements of the Deal zoning ordinance. The house fronts on Parker Avenue to the south and, apparently, in order to have complied with the zoning ordinance it should have been built facing Norwood Avenue to the west. The municipality had acquired title to lot 11B immediately adjacent to lot 11A on the north, by tax foreclosure in 1942. In 1945 the plaintiffs, by deed without restriction, purchased lot 11B from the municipality at a public auction sale. Thereafter, in 1947 the plaintiffs, without obtaining a building permit, converted the attached garage on 11A into a recreation room.

The following year plaintiffs obtained a building permit for and constructed a two-car garage, located on lot 11B. The garage was purposively located in such a manner as to be accessible from either the house on 11A or any house

which might in the future be constructed on 11B (fronting on Norwood Avenue). The application specified that the address location for the garage was Parker Avenue, but the application was filed by the builder and he testified that he placed the Parker Avenue address on the permit solely because that was where plaintiffs resided.

In January of 1955 the plaintiffs contracted to sell lot 11A to a third person. In order to effectuate the purchase the plaintiffs were required by the purchaser to lease one-half of the garage located on 11B together with a right of way for a period of 99 years. Title passed in May of 1955.

In March of 1955 the plaintiffs made application for a building permit to construct a residence on 11B for their own use. This permit was denied by the building inspector. Instead of appealing from the denial of the permit to the board of adjustment, *N. J. S. A.* 40:55–39(*a*), or to the Superior Court, on the theory that the zoning ordinance was not violated, the plaintiffs made application to the board of adjustment for a variance, *N. J. S. A.* 40:55–39(*d*).

The board recommended a variance, but the board of borough commissioners disapproved the request. No further action was taken. Plaintiffs, having sold their home on 11A, acquired other quarters.

Some time later the plaintiffs succeeded in finding a prospective purchaser for 11B, but the prospective purchaser sought assurances that he would be able to build on the lot. Accordingly, on August 19, 1956 the plaintiffs again made application for a building permit, this time submitting the plans of the proposed purchaser. The application was denied and plaintiffs' sale failed of consummation. The instant in lieu proceeding ensued.

The municipality's theory in denying the permit was that plaintiffs' initial purchase of lot 11B, or the subsequent construction of the garage thereon, caused the lots to be joined. The municipality asserts that this joinder cured the rear-yard violation of lot 11A and that the lots cannot now be severed and treated as independent parcels of realty.

## I—Procedure.

Initially the defendant asserts that *R. R.* 4:88–15(*b*)(3) and the case of *Home Builders Ass'n of Northern N. J. v. Paramus Boro.*, 7 *N. J.* 335 (1951), operate to bar the instant in lieu proceeding. The argument is that since plaintiffs failed to appeal from the resolution of the governing body of 1955 rejecting plaintiffs' request for a variance within 30 days, as required by the former version of *R. R.* 4:88–15(*b*)(3) applicable to those proceedings, they may not revive the lost right by their present course of action.

In the *Home Builders* case, *supra,* the plaintiff had initially sought a variance which was refused by the board of adjustment. It then applied for a variance, based upon submitted plans which were substantially similar to those initially rejected by the municipality. We held:

"The defendants further argue that the plaintiff, having failed for more than 14 months to appeal the earlier decision of the Board of Adjustment wherein the Board denied the variance sought but granted a lesser variance, may not now be permitted by indirection to review that action merely by the filing of an application for identical relief and the suffering of a denial thereof. There appears in the record before us no semblance of reason for the plaintiff's delay of a year in questioning the Board's earlier action. It appears that the grant of the 25-foot variance made by the Board in 1949 remains unrevoked, and that the Board's action in regard thereto was not appealed. There is no attempt on the part of the plaintiff to show any change in its status nor in the situation or condition of the premises in question, indicative of hardship in the strict application of the terms of the zoning ordinance to an extent not existing at the time of the earlier application in 1949. The plaintiff should not be permitted by indirection to review so much of the decision of the Board of Adjustment of March 8, 1949, as was not acceptable to it. Compare *Sitgreaves v. Board of Adjustment of Town of Nutley*, 136 *N. J. L.* 21 (*Sup. Ct.* 1947), and *Crescent Hill, Inc. v. Board of Allendale*, 118 *N. J. L.* 302 (*Sup. Ct.* 1937). In passing we note our recent rule on this subject, *Rule* 3:81–15 [now *R. R.* 4:88–15(*b*)(3)]." 7 *N. J.*, at *page* 342.

The course pursued by plaintiffs herein was essentially different. Upon refusal of the first request for a building

permit, they sought a variance under *N. J. S. A.* 40 :55–39 (*d*), a matter within the sound administrative discretion of the board of adjustment and board of borough commissioners. See *Zahodiakin Engineering Corp. v. Zoning Bd. of Adjustment*, 8 *N. J.* 386, 394 (1952). When that attempt failed, they thereafter sought to raise in the instant proceedings the purely, legal question of whether, under the terms of the zoning ordinance, they are entitled to the permit as a matter of right. Plaintiffs are not seeking to raise indirectly in this proceeding (as was done in *Home Builders*) the question of whether the variance should have been granted. Therefore, the rationale of the *Home Builders* case would not bar the instant action unless (as will be hereinafter discussed) the plaintiffs should have sought to raise the legal question involved by in lieu proceedings within the time limits prescribed by *R. R.* 4:88–15, either upon the initial denial by the building inspector or after the decision of the governing body of the municipality denying the variance.

Reliance is also stressed on the case of *Sitgreaves v. Board of Adjustment of Nutley*, 136 *N. J. L.* 21 (*Sup. Ct.* 1947), which does support somewhat the defendant's position here. That case involved an attempt to seek judicial review of a second denial of a variance. The Supreme Court concluded that the plaintiff's failure to seek judicial review of the initial variance request precluded review of the second determination and also precluded review of an additional legal ground for relief not advanced in the initial proceeding.

But the *Sitgreaves* case was decided prior to the changes wrought in prerogative writ practice by the 1947 Constitution and implementing rules, 1947 *Const., Art.* VI, *Sec.* V, *par.* 4; *R. R.* 4:88, and has no compelling force.

The keynote of the new prerogative writ practice was sounded by Mr. Chief Justice Vanderbilt in *Ward v. Keenan*, 3 *N. J.* 298 (1949). After outlining in detail the previous frailties, and the curative measures contained in the new practice, he concluded that the governing principles for in

lieu procedures were essentially equitable in nature in these words:

"Our problem is, therefore, by rules of court and judicial decisions, to preserve as far as may be the substantive law of the former prerogative writs as a means of safeguarding individual rights against public officials and governmental bodies, while at the same time avoiding the defects of procedure that led to criticism. * * * In determining what course to pursue under the new practice in this field we should look to the decisions on the old procedure on prerogative writs, not as controlling authorities but for what light they may throw on the instant problem of presenting sound rules of procedure. Much light may also be gained from examining the practice in analogous cases of equitable procedure, for it is becoming increasingly clear, now that discretion in granting of the writ has been abolished, that the procedural principles applicable in the two fields are in many respects identical." 3 *N. J.*, at *pages* 308–309.

The main concentration of the attack on the previous practice was the abolition of the metaphysical distinctions between the various prerogative writs, which was accomplished by providing a single uniform proceeding in which to achieve judicial review of governmental action, and the granting of the new in lieu review as a matter of right rather than of discretion. In the formative era of the new rules perhaps too little attention was afforded to the strict statutory time limitations which were designed to preclude rather than foster judicial review of governmental action. While the Constitution granted the Supreme Court the power to superintend the time within which in lieu relief might be sought, *Fischer v. Twp. of Bedminster,* 5 *N. J.* 534 (1950), the former versions of *R. R.* 4:88–15 were, in the main, adoptions of the prior restrictive statutory time limitations. See *Moran, "General Administrative Law,"* 10 *Rutgers L. Rev.* 37, 83–85 (1955). The ramifications of this rigid policy in terms of fostering equitable alternatives to in lieu relief are explored in *Note,* 10 *Rutgers L. Rev.* 673 (1956).

Exceptions in the form of decisional law were soon forthcoming. Important constitutional questions were not barred, *Holloway v. Pennsauken Twp.,* 12 *N. J.* 371 (1953); *McKenna v. New Jersey Highway Authority,* 19 *N. J.* 270 (1955); *Oldfield v. Stoeco Homes,* 26 *N. J.* 246 (1958),

although the rule by its terms contained no such exceptions. The rule was further expanded by judicial definition of what constitutes final administrative decisions referred to in *R. R.* 4:88–15(*b*), *Dolan v. DeCapua,* 16 *N. J.* 599 (1955); *Thornton v. Village of Ridgewood,* 17 *N. J.* 499 (1955); *Tomko v. Vissers,* 21 *N. J.* 226 (1956), and by an expansive treatment of when a cause of action accrues within the meaning of *R. R.* 4:88–15(*a*), *Yannuzzi v. Mayor and Council of Borough of Spring Lake,* 22 *N. J.* 567 (1956); *Lettieri v. State Board of Medical Examiners,* 24 *N. J.* 199 (1957). But *cf. Marini v. Borough of Wanaque,* 37 *N. J. Super.* 32 (*App. Div.* 1955). These in turn gave rise to a general revision of *R. R.* 4:88–15, with the ultimate addition in 1957 of paragraph (c) which provides:

"Where it is manifest that the interests of justice require, the court may enlarge the period of time provided for in paragraph (a) or (b) of this rule."

It is true, as the defendant asserts, that these proceedings are bound by the former version of *R. R.* 4:88–15 in effect in 1955. But it is equally true that paragraph (c) is merely an attempt to restate in the form of a generalized standard, decisional exceptions which had already been engrafted upon the rule. It will thus be useful to consider the nature of those exceptions, both for the purpose of the disposition of the procedural question on this appeal and to attempt to provide for the future a specific content to the phrase "where it is manifest that the interest of justice require" in *R. R.* 4:88–15(*c*).

We pursue the question of whether the plaintiffs were required to commence in lieu proceedings upon the denial by the building inspector of the first permit. Integrally related is the problem of exhaustion of administrative remedies required by *R. R.* 4:88–14. Since plaintiffs' right to the permit turns on a purely legal question, not dependent for its resolution upon matters within administrative expertise, a right to immediate in lieu relief was acquired at the time of the first denial. *Honigfield v. Byrnes,* 14 *N. J.* 600 (1954)

and see *Nolan v. Fitzpatrick,* 9 *N. J.* 477 (1952); *Stalford v. Barkalow,* 31 *N. J. Super.* 193 (*App. Div.* 1954); *Deaney v. Linen Thread Co.,* 19 *N. J.* 578 (1955).

■ The triggering point for the time bar of *R. R.* 4:88–15(a) is the "accrual of the right to such review." If read literally, that subsection of the rule would seem to require that in lieu relief be commenced within 30 (now 45) days after the building inspector's denial of the permit. But the rule was aimed at those who slumber on their rights, and, clearly, one who diligently pursues an administrative appeal is not within that category. The permissive extraordinary right to commence in lieu relief under *R. R.* 4:88–14 prior to exhaustion of administrative remedies in those cases subject to summary judgment disposal, cannot commence the running of the time limits of *R. R.* 4:88–15. See *Moran, "General Administrative Law,"* 9 *Rutgers L. Rev.* 40, 72–74 (1954). Although the right to relief has accrued, the interests of justice require, at least, that the litigant be permitted, if he so desires, to exhaust all administrative remedies before commencing an in lieu action.

But even if no appeal is taken (where the right to the permit turns on questions of law, not within administrative expertise) from the denial of permit by a building inspector, the property owner should not ordinarily be foreclosed from later making a re-application for a permit and then seeking ultimate judicial review. The general problem implicated here was the subject of attention in both the *Yannuzzi* and *Lettieri* cases, *supra.* It concerns the proper application of the time bar of *R. R.* 4:88–15(a) to instances of informal or *ex parte* administrative determinations where the relief sought turns on a legal question or questions. The import of the *Yannuzzi* and *Lettieri* exceptions to *R. R.* 4:88–15 is that where informal or *ex parte* determinations are made by administrative officials charged with the performance of ministerial functions, there is not ordinarily a sufficient crystallization of a dispute along firm lines to call forth the policy of repose. See *Moran, "General Administrative Law,"* 12 *Rutgers L. Rev.* 26, 88–89 (1957).

Lack of crystallization of a dispute would be especially true of the ordinarily informal dealings between the landowner and building inspector. The landowner seldoms retains counsel at this stage of the administrative proceedings. Denials are rarely unequivocal and negotiation is a commonplace. If submitted plans are rejected, they are often modified and resubmitted in an effort to conform. A strict adherence to timing requirements under these circumstances would only work inequities in individual instances and tend to stifle salutory efforts at negotiation before judicial relief is sought.

The governing criterion for the rigid application of the time limits of the rule is not, as was stated by the Appellate Division below, whether the action sounds in *mandamus* or *certiorari*. It is rather a policy consideration that before a litigant's right which turns on a question of law is barred, there ought to be a formal hearing and adjudication on the question with appropriate written conclusions of law and fact. See *Tomko v. Vissers, supra.* We do not say that a legal right cannot be finally resolved by an administrative determination from which review is not timely sought. The exceptions to *R. R.* 4:88-15 which are grounded solely on the nature of the question of law involved, relate only to important constitutional law questions. *Holloway v. Pennsauken Twp.; McKenna v. New Jersey Highway Authority; Oldfield v. Sloeco Homes, Inc.,* all *supra.* But before a right to relief which turns on legal questions of lesser importance is barred by the failure to seek in lieu relief, the process by which such right is determined at the administrative level ought to be of such a nature as to fully impress upon the litigant both the finality of the determination and the precise grounds upon which relief was denied. Ordinarily, informal or *ex parte* determinations of administrative officials charged with the performance of ministerial duties are not of such a nature.

In sum, it may be said that the interests of justice would ordinarily require that an extension be permitted for an out of time attempt to obtain judicial review of an informal or *ex parte* administrative determination, where the

right to relief depends upon the determination of a legal question. This is so in the absence of laches or of prejudice resulting to the government from the extension. See *Thornton v. Village of Ridgewood, supra,* 17 *N. J.* at *page* 510; *cf. Duke Powder Co. v. Patten,* 20 *N. J.* 42 (1955).

## II—MERITS.

■ It should first be noted that the plaintiffs never in fact intended to join lots 11A and 11B. The plaintiffs testified that they never knew that the house on 11A was in violation of the zoning ordinance until the time of the application for the first building permit in 1955. The trial court found this to be the fact and we are in accord. Thus, a resulting inference may be drawn that they did not purchase 11B in order to "cure" an existent violation on 11A. The consideration given to the location of the garage built on 11B so that it might serve a future home on that lot is again cogent evidence of a lack of intention to join 11A and 11B. Moreover, the municipality itself has always issued separate tax bills for the lots in question, so that the plaintiffs would have no knowledge prior to 1955 that the municipality considered the lots as one.

The defendant contends that the purchase of 11B cured a non-conforming use and that under the terms of the ordinance (as well as the decisional law) once a non-conforming use is abandoned it cannot be revived.

The house on 11A was constructed in 1931 or 1932, the violated zoning ordinance was adopted in 1923. At its inception the house was in violation of the zoning ordinance, it was never a legal non-conforming use. Moreover, ignoring the conceptual difficulties created by the characterization of the violation of the side- and rear-yard requirements as a "use" and the act of construction of the garage as an "abandonment" of that "use," and treating the instant problem as analogous to a situation where a legal non-conforming use is abandoned, still the argument will avail the defendant little. It is well established that before a non-conforming

use has been found to be abandoned, there must be an intention on the part of the landowner permanently to relinquish the use. *Metzenbaum, Law of Zoning*, 1263–71 (1953); 2 *Rathkopf, Law of Zoning and Planning*, 49 (1956). As previously stated the facts clearly indicate that in constructing the garage the plaintiffs did not intend to join lots 11A and 11B and treat them as one parcel of realty.

The main thrust of the defendant's argument is that under the terms of the Deal zoning ordinance a garage in a residence district No. 4 may only be constructed as an accessory to and on the same lot as a dwelling house. He contends that when the garage on 11B was erected this act created a joinder of the two lots. Apparently the unarticulated premise is that since the construction of the garage on 11B would, absent a joinder, be a violation of the zoning ordinance, the plaintiffs should be estopped by operation of law from denying the joinder.

 In our view the zoning ordinance does not require that a garage in a residence District No. 4 zone be built on the same lot as the dwelling which it serves. The pertinent portions of the ordinance are as follows:

"Section 9—Districts (2) to (7) incl. and 9: Use Provisions.

Within the residence Districts Nos. * * * 4, * * * and * * * no building or premises shall be used for other than one of the following purposes:

(a) A dwelling for one family or for one housekeeping unit.

(b) Farms, Nurseries or Greenhouses, not operated for profit provided there is no display of products, other than in growth."

Section 13 provides in part:

"In all Residence Districts a private garage in which no business, service or industry, connected directly or indirectly with motor vehicles is carried on is permitted."

Section 6 provides:

"Section 6—Rear Yards and Side Yards.

(a) In all districts a rear yard is required. Its depth at the ground story level shall not be less than 20 per cent of the depth of the lot, except that it need not exceed fifty feet in any case.

One story or two story detached structures for permitted accessory uses, including permitted garages, may occupy not over 35 per cent of the required yard area, provided that any such structure is not over 30 feet in height above the adjacent finished grade, and provided that it is everywhere distant at least three feet from each side and rear lot line."

The defendant asserts that by reading sections 9 and 13 together an intention is spelled out to limit the construction of garages in residence districts to accessory uses to a dwelling house. We are in agreement with that construction. Clearly, if only a residence use or other uses not here pertinent are permitted in a residence District No. 4, then the garage exception (in which no business, service or industry is carried on) permitted by section 13 can only be an accessory use to an existent dwelling house. And this construction is buttressed by the language of section 6 in relation to "permitted accessory uses."

But the ordinance does not, by its plain terms or by fair implication, require that such a permitted accessory garage must be constructed on the same lot as the dwelling which it serves. The *most* that can be derived from section 6 is that if the accessory garage is built on a vacant lot other than the one on which the principal dwelling is located, the area restriction contained therein must be complied with.

There obviously are a number of approaches which a governing body could in its judgment adopt, consistent with the objectives of the zoning statute. It could provide that the dwelling and the garage accessory to it shall be situate on the same lot, as indeed some municipalities have legislated. See *Collins v. Board of Adjustment of Margate City*, 3 *N. J.* 200 (1949); *Peterson v. Bd. of Adjustment, Montclair*, 7 *N. J. Super.* 282 (*App. Div.* 1950). On the other hand, it could conclude that the erection of an accessory garage on a contiguous lot in the same ownership furthers its policy decision. The language chosen and immediately involved does not embrace the more restrictive approach; nor can we find anywhere in the ordinance any evidence of it. Hence the erection of the garage on 11B cannot be said to have violated the terms of the ordinance. We cannot

in the guise of interpretation redraft an ordinance to supply limitations which the governing body could have adopted but in no wise evidenced. As stated by Mr. Chief Justice Weintraub (then Judge) in *Jantausch v. Borough of Verona,* 41 *N. J. Super.* 89 at *page* 104 (*Law Div.* 1956), affirmed 24 *N. J.* 326 (1957), the right of the citizen who seeks in good faith to utilize his property "should not depend upon the outcome of litigation after the event in which a provision, which he apparently fully meets, assumes a new and different significance by a process of refined interpretation."

The municipality envisages as a result of this construction a possible situation where there might be "a garage on each lot in a block or in the whole district, each garage being totally disassociated with any dwelling or residential purposes, with the result that in this district, zoned for one family dwelling purposes only, there might be nothing but garages." This fear, we think, is more imaginative than real and, in any event, is not presented by the situation before us. We go no further than to hold that the erection of the accessory garage on a lot contiguous to the lot upon which the dwelling is situate, at least when both lots are in the same ownership, is authorized by the ordinance. If the municipality desires to adopt a different approach, it of course may by amendment do so.

The question whether the owner of a dwelling may use a garage erected on land owned by another is not before us and hence we express no view upon it. If such use constitutes a violation of the ordinance, that violation here occurred when the owner of lot 11A continued to use the garage after the severance of title to the lots. The erection of a dwelling on lot 11B would not itself create a violation since, of course, the garage on 11B is an appropriate accessory use for the dwelling on that lot. If the municipality deems the continued use of the garage by the owner of the lot 11A to be violative of the ordinance, there are appropriate proceedings which it may institute in furtherance of that view.

The judgment below is affirmed.

PROCTOR, J. (dissenting in part). I join in the majority opinion with respect to the issues relating to the procedural aspects of the case but disagree with its conclusion on the merits.

The dwelling located on lot 11A was constructed in violation of the zoning ordinance in that it did not conform with the rear-yard requirement. When the plaintiffs purchased lot 11B this violation was remedied as there was then sufficient property under common ownership to meet the rear-yard requirement. This was unaffected by the purpose for which plaintiffs purchased lot 11B, for it should follow as a matter of law. That part of the land of lot 11B which constituted the area of the rear yard of the dwelling on lot 11A became as much a part of that dwelling as if they had constructed an addition thereto. Clearly, if they had followed this course there would have been a joinder of the two lots. And it is equally true that this use of the land on lot 11B to remedy the violation of the rear-yard requirement must also be viewed as a joinder of the two lots, at least to the extent of that part of lot 11B necessary to supply the rear-yard deficiency of lot 11A. The effect of the majority opinion in failing to recognize the joinder of the two lots is to permit a re-creation of a violation of the ordinance as to lot 11A. Once a violation has been remedied its re-establishment should not be sanctioned. Otherwise, it would constitute discrimination against other property owners in the zone and tend to destroy zoning as an instrument of orderly municipal government. See *Barbarisi v. Board of Adjustment, Paterson,* 30 *N. J. Super.* 11, 17 (*App. Div.* 1954).

Mr. Justice HEHER joins in this dissent.

*For affirmance*—Chief Justice WEINTRAUB, and Justices WACHENFELD, BURLING, JACOBS and FRANCIS—5.

*For reversal*—Justices HEHER and PROCTOR—2.